IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ANGELA CELA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:09-0173 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| TENNESSEE STATE UNIVERSITY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

Before the Court is the Plaintiff's motion to alter or amend (Docket Entry No. 53) the Order denying class certification (Docket Entry No. 52). In that ruling, the Court concluded that Plaintiff failed to satisfy three requirements of Rule 23: numerosity, typicality and adequacy as a class representative. (Docket Entry No. 51, Memorandum at 7-13).

Plaintiff, Angela Cela, filed this action individually and on behalf of all others similarly situated, under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d et seq. and 42 U.S.C. § 1983 against the Defendants: Tennessee State University ("TSU"); Dr. Iris Johnson-Arnold; Dr. Tina Smith; and Dr. Harold Mitchell. Plaintiff asserts claims of racially discriminatory awarding of grants in TSU's "Base-TN Recruitment and Retention" program in its Department of Speech Pathology and Audiology. Plaintiff seeks to represent a class of all non-African Americans who enrolled or attempted to enroll in this graduate program since 2002 and who were denied the opportunity to receive funding under the BASE-TN Recruitment and Retention program on account of their race.

In her motion to alter or amend, Plaintiff argues, in essence: (1) that there was not any evidence of numerosity to justify the Court's ruling and (2) the statute of limitations should be tolled due to the Defendants' fraudulent concealment of putative class members potential claims. (Docket Entry No. 54, Plaintiff's Memorandum at 4-6 and Docket Entry No. 62, Plaintiff's Reply at 1). Plaintiff submits excerpts of the deposition of Dr. Cleo Harris in support of her motion.

In response, Defendants contend, in sum: (1) that Plaintiff's proposed class is too broad; (2) that claims of members of the putative class are time-barred by the applicable statute of limitations; and (3) the statistical evidence of financial aid in TSU Department of Speech Pathology and Audiology's graduate program reveals substantial numbers of white students received financial aid.

In her reply, Plaintiff asserts that "[f]or the first time, Defendants have determined and published the number and race of students actually enrolled in the graduate program of the Department of Speech Pathology and Audiology from 2008 to 2011." (Docket Entry No. 62 at 2). Plaintiff also argues that the Defendants now admit that they "prepared and published" a flyer that the "BASE-TN recruitment grant was only available to African-American students". Id. Plaintiff also submits the affidavit of Dr. John Ashford, a TSU professor, and excerpts of the depositions of Kathleen McEreney, Sandra E. Keith and Dr. Johnson-Arnold.

**A. Analysis of the Motion**

In her motion for class certification, Plaintiff sought to represent the following class of TSU students:

> All non-African American students enrolled or who attempted to enroll, in the Graduate Program of the Department of Speech Pathology and Audiology of Tennessee State University from 2002 to present who were denied by Defendants

2

the opportunity to receive funding under the BASE-TN Recruitment and
Retention Grant on account of their race.

(Docket Entry No. 46, Plaintiff's Memorandum at 3).

The BASE-TN recruitment program[1] in TSU's Department of Speech Pathology and Audiology provided on-campus students with financial support for graduate studies in that department in exchange for the students' agreement to serve as special education teachers for two years in a Tennessee public school. To be eligible for grants under this BASE-TN program, on-campus students had to be Tennessee residents for "a minimum of twelve consecutive months prior to receiving the BASE-TN Support," cannot be licensed as a Tennessee special education teacher, cannot b e the recipient of similar financial aid, and must possess a "B" average. (Docket Entry No. 46-8 at 9, 11-12, Plaintiff's Exhibit H, BASE-TN Teaching Program; Docket Entry No. 49-2 at 4-5). With their applications, students also had to "[s]ubmit a signed and notarized Student Service Agreement" to work in a Tennessee public school as special education teacher for two years for each academic year funded through the program. Id. at 9.

TSU operated this BASE-TN recruitment program from 2002 until 2008 under the auspices of the Tennessee Department of Education ("TDOE"). TDOE terminated the program in 2008 for the 2008-09 academic year because the program was not recruiting sufficient students to justify TDOE's continuing financial support. (Docket Entry No. 49-1 Harris deposition at 4-5, 8). The "biggest issue" with the program "was the fact that we [TDOE] required two years of service for each 27 hours of support." Id. at 7.

---

[1] As stated in the original Memorandum, there are two programs: (1) the BASE-TN recruitment program for which Plaintiff applied and (2) the "distance ed" or "distance learning" "program for off-campus students who must be located within a certain radius of the campus. According to Smith, who had principal responsibility for the "distance ed" program, that application process is different. (Docket Entry No. 49-2, Smith Deposition at 2-3).

3

As evidence of the Defendants' racially discriminatory administration of the BASE-TN recruitment and retention program, Plaintiff's proof on her motion to certify included a 2002 document entitled "Proposal" for TSU's BASE-TN recruitment grant program with an "Abstract" that TSU sent to TDOE. This document states, in relevant part that "the purpose of this project is to recruit, train and retain 12 minority students (both bachelor and graduate level) in the area of speech-language pathology as they pursue a master's degree." (Docket Entry No. 46-9 at 10). Plaintiff's proof on her original motion included a "Summary of Grant Performance 2002-2004 Abstract" that reflects a total of 12 students enrolled in the BASE-TN recruitment program in 2002-03 and 7 new students for 2003-04. (Docket Entry No. 46-12 at 2, 3 ).

Plaintiff's proof on her motion to certify also cited a departmental flyer in 2002 describing the purpose of this BASE-TN program was "to recruit, train and retain minority students in speech language pathology as they pursue a master's program" in the department. (Docket Entry No. 46-10 at 1). Such a statement is not in the program approved by the TDOE. (Docket Entry No. 46-8 at 2). TDOE's grant agreement with TSU included a non-discrimination clause. (Docket Entry No. 46-11 at 5).

Plaintiff cites Dr. Cleo Harris as describing the TSU departmental document as "illegal", "improper" and "misleading." (Docket Entry No. 54-1 at 16-19; Docket Entry No. 46-6 at 10). Dr. Harris also testified that despite the cited language in TSU's proposal and flyer language: "I don't believe Tennessee State was discriminating" (Docket Entry No. 49-1 at 9, 13). Dr. Harris explained that the language in TSU's grant proposal cited by the Plaintiff did not define the operation of the TDOE approved program under the TDOE-TSU contract. (Docket Entry No. 54-1 at 11) ("That may be in their proposal, but that's not in our contract. And I recall the first year, one of the first students, I believe to graduate was a Caucasian young lady from East

4

Tennessee".). See also id. at 12, 13. Dr. Harris also discussed the flyer with TSU officials in 2002 and directed them to eliminate the race language from the flyer (Docket Entry No. 46-6 Harris deposition at 6, 9-10). Dr. Harris explained that the 2004 abstract or summary of grant performance was not a document requested by TDOE and "[m]aybe they were submitting a proposal to the feds for granting." (Docket Entry No. 54-1 at 15). As set forth below, the Plaintiff's statistical proof tends to corroborate Dr. Harris's testimony.

Dr. Tina Smith who assisted in the operation of TSU's BASE-TN program at its inception and worked on the distance ed part of the program, did not consider the program's purpose to exclude non-African Americans and as federal grants[2], Dr. Smith considered recruitment of minorities to include "Hispanics, Asians, Caucasians," male and female, for the TSU program. (Docket Entry No. 49-2, Smith deposition at 7-8). Dr. Smith cited that less than 2% of the American Speech Language and Hearing Association's members are minorities. Id at 8. According to Dr. Smith, "I've had probably three or four students to really talk to me about the recruitment grant," id. at 13, and "[w]e had very few applicants for the recruitment grant." Id. at 14. A Hispanic student requested a BASE-TN grant, but elected not to take the grant. (Docket Entry No. 46-3 at 15). According to Smith, "the white students who talked to me about the grant were funded on the grant." Id at 11. Smith never told a grant applicant that he or she was ineligible for the grant. Id.

The record also reflects that Plaintiff was offered, but rejected a "BASE-TN grant." Plaintiff's Exhibit G (Docket Entry No. 46-7), contains the following description:"The student rejected the University's offer for funding through the BASE-TN grant for the 2007-08 academic

---

[2] Plaintiff's proof reflects that the origin of the funds for this program were federal funds. (Docket Entry No. 46-11).

5

year." Id at 1. McEnerney testified to her belief that Plaintiff "declined the grant." (Docket Entry No. 62-2 at 4). Keith testified that Plaintiff was offered a grant. (Docket entry No. 62-3 at 5).

Plaintiff's original motion argued that at the time of the events at issue that she was a Tennessee resident, (Docket Entry No. 46-11), but Plaintiff's affidavit (Docket Entry No. 46-1) that has not been amended, never mentions her actual residence. In her motion to alter or amend, Plaintiff contends that the Defendants never asked Plaintiff about her actual residence. (Docket Entry No. 62 at 8-9) (quoting the Keith and Johnson-Arnold depositions). Plaintiff also attached a computer generated map that shows the address 1318 Mississippi to be in Clarksville, Tennessee. (Docket entry No. 62-3 at 14). Yet, Keith's deposition reflects as to Plaintiff's residence that: "I reviewed her complaint. And **on her complaint it put her address in Kentucky. And I also checked her graduate application and it revealed that she resided in Kentucky**". (Docket Entry No. 62-3 at 5) (emphasis added). See also id. at 7, 9, In addition, Dr. Johnson-Arnold informed Keith of Plaintiff's statement that she was a Kentucky resident. Id at 10.

Plaintiff cites that non-Tennessee residents received a BASE-TN grant and that McEnerney considered Plaintiff eligible for a BASE-TN grant. (Docket Entry No. 62-2 at 5). Yet, McEnerney made her decision based upon her information, and a faculty committee later determined Plaintiff was ineligible. Id at 5. As to the non Tennessee grant recipients, those students received a grant for agreeing to work for the State of Tennessee. Id. at 6.

Plaintiff's proof included a TSU report on her administrative complaint that includes the following statement: "Dr. Johnson-Arnold met with the student complainant during the spring 2007 semester. Dr. Johnson-Arnold states: 'I asked if she would be willing to stay in Tennessee and work in the school system. She told me (and I am paraphrasing) that her husband was in the

6

military and she was unsure of her future plans". (Docket Entry No. 46-7 at 6). This report also reflects that: "The student complainant is a resident of Kentucky and has been classified as in-state resident for tuition purposes only. As a resident of Kentucky she is only eligible for BASE-TN funding if she is currently teaches in the Tennessee school systems. The student complainant is not teaching in the Tennessee school systems." Id. at 7.

As to Plaintiff's assertion of the lack of any statistical proof of students by race in the BASE-TN recruitment program for the Court's ruling on numerosity, throughout this program, the total number of students cited varied. Based upon Plaintiff's proof in support of her motion to certify, the BASE-TN recruitment program was intended for 12 to 17 minority students for each academic year from 2002 to 2008. (Docket Entry No. 46, Exhibit I at 10; Exhibit L at 1; Exhibit N at 2; Exhibit O at 1). Plaintiff's proof also included a report on her administrative complaint for racial discrimination that reflects "about 6 to 7 grants were filled by **her** peers," (Docket Entry No. 46-7 at 3) (emphasis added), and that there were "8 African Americans on the BASE-TN grant." Id.

This report on the Plaintiff's administrative complaint also reflects that from 2002 through spring 2006, 35 white students received grants from TSU's BASE-TN recruitment grant program, id. at 6, but none from summer 2006 to 2008. Id. Plaintiff's exhibit submitted on her motion to certify reads, in relevant part:

> According to University records, the African Americans who received BASE-TN funding in Fall 2007 all had a GPA of 3.1 or higher. As detailed below, the BASE-TN grant has been awarded to ethnic minority and Caucasian students.
>
> BASE-TN RECRUITMENT GRANT STUDENTS
> Summer 2002-Summer 2008
>
> AA=African American                                                                 WH=White

| Semester | Race |
|---|---|
| Summer 2002 | 1-AA |
| Fall 2002 | 3-AA, 3-WH |
| Spring 2003 | 3-AA, 3-WH |
| Summer 2003 | 6-AA, 5-WH |
| Fall 2003 | 11-AA, 6-WH |
| Spring 2004 | 11-AA, 4-WH |
| Summer 2004 | 9-AA, 3-WH |
| Fall 2004 | 12-AA, 4-WH |
| Spring 2005 | 8-AA, 4-WH |
| Summer 2005 | 7-AA, 1-WH |
| Fall 2005 | 9-AA, 1-WH |
| Spring 2006 | 9-AA, 1-WH |
| Summer 2006 | 6-AA |
| Fall 2006 | 10-AA |
| Spring 2007 | 10-AA |
| Summer 2007 | 2-AA |
| Fall 2007 | 5-AA |
| Spring 2008 | 7-AA |
| Summer 2008 | 5-AA |

(Docket Entry No. 46-7 at 6, Plaintiff's Exhibit G). Of the actual enrolled students in TSU's BASE-TN recruitment program, Plaintiff's proof was, depending on the level of overlap between the two year program, that there were 26 to 35 white students who enrolled **and received BASE-TN recruitment grants**. Id.

In her affidavit, Plaintiff refers to 12 non-African American students who attended the meeting on her complaint of racial discrimination. (Docket Entry No. 46-1, Cela Affidavit at ¶ 20). In its response to Plaintiff's motion to alter or amend, the Defendants present statistical evidence that for the academic years from 2008 through 2011, of the 314 non-black students in

TSU's Department of Speech Pathology and Audiology graduate program, 259 non-Black students received financial aid. (Docket Entry No. 58, Perry Affidavit at 2).

To be sure, Dr. John Ashford, who has been a professor in TSU's Department of Speech Pathology and Audiology since 1986, submitted his affidavit that he is aware of the BASE-TN recruitment grant program at TSU and that "Dr. Harold Mitchell continuously represented to students that the BASE-TN grant was for African American students only." (Docket Entry No. 62-1, Ashford Affidavit at ¶ 8). Dr Ashford also states that: "I am aware of several white students who needed financial aid, who wanted to work in the Tennessee public school system and who were qualified for the BASE-TN grant. I am aware that several of these white students did not apply for the BASE-TN grant **because they were not eligible because they were not African American**". Id. at ¶¶ 10-11 (emphasis added).

### B. Conclusions of Law

For Plaintiff's motion to alter or amend under Fed. R. Civ. P. 59(e), such a motion can be granted where "there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 834 (6th Cir. 1999) (internal citations omitted); see also Tritent Int'l Corp. v. Kentucky, 395 F. Supp.2d 521, 523 (E. D. Ky. 2005). A Rule 59(e) motion is not "an opportunity to reargue a case." Sault Ste. Marie Tribe of Chippewa Indians v. Engler, 146 F.3d 367, 374 (6th Cir.1998). Given these purposes, the Court reviews the undisputed facts that warranted and continue to warrant denial of class certification.

As a threshold observation, however, the Supreme Court has observed about class actions under Title VII involving claims of racial discrimination that:

> We are not unaware that suits alleging racial or ethnic discrimination are often by their very nature, class suits, involving class-wide wrongs. Common questions of law or fact are typically present but careful attention to the requirements of Fed. R. Civ. P. 23 remains nonetheless indispensable. The mere fact that a complaint alleges racial or ethnic discrimination does not in and of itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.

E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 405-06 (1977).

Plaintiff's proposed class includes former students from 2002 to 2008 whose claims are barred by the applicable statute of limitations. Simmons v. Middle Tennessee State University, 117 F.3d 1421, No. 95-6111, 1997 WL 400105 at *2, (6th Cir. July 11,1997). Plaintiff argues that the statute of limitations should be tolled on grounds of fraudulent concealment. For fraudulent concealment, Plaintiff must allege affirmative acts of concealment, Electric Power Bd. of Chattanooga v. Monsanto Co., 879 F.2d 1368, 1377 (6th Cir. 1989) and that: (1) defendants concealed the conduct that constitutes the cause of action; (2) defendants' fraudulent concealment prevented plaintiff from discovering her claim within the limitations period; and (3) until discovery of the claim, plaintiff exercised due diligence about her claim. Pinney Dock and Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1465 (6th Cir. 1988).

As to Plaintiff's fraudulent concealment contention to toll the statute of limitation, Plaintiff expressly asserts that the Defendants "specifically and repeatedly stated that the grant was only for African-American students" [ ] "in the official reporting to the Department of Education . . . and statements to non-African-American students" and "prepared and published a flyer ... specifically stating that the BASE-TN recruitment grant was only available to African-American students." (Docket Entry No. 54, Plaintiff's Memorandum at 2-3). Plaintiff also submits Dr. Ashford's affidavit that Dr. Mitchell "continuously represented to students that the BASE-TN grant was for African American students only." (Docket Entry No. 62-1, Ashford

Affidavit at ¶ 8). In the Sixth Circuit, a plaintiff's claim arises when the plaintiff is placed on actual knowledge of the facts giving rise to his or her claim. Hughes v. Vanbderbilt, 215 F.3d 543, 548 (6th Cir. 2000). Under the applicable law, Plaintiff's allegations and proof preclude any finding of the Defendants' "concealment" of the program's purported purpose. Thus, there are not grounds for equitable tolling here.

As to the requirements of typicality and adequacy, serious issues exist on Plaintiff's ability to serve as class representative. The first factual issue is whether Plaintiff is eligible for a BASE-TN grant. Plaintiff's affidavit fails to identify her actual residence at the time at issue. (Docket Entry No. 46-1). Assuming the trier of fact credits TSU officials' statements and Plaintiff's statements on her graduate application that Plaintiff is a Kentucky resident, then Plaintiff would be found ineligible for the grant. If that determination were made, then, if certified as a class, the entire class would suffer an adverse determination.

The second factual issue is whether Plaintiff agreed to teach for two years in the Tennessee school system, as required by the BASE-TN recruitment grant. The BASE-TN application requirement included "a signed and notarized Student Service Agreement" (Docket Entry No. 46-8 at 9). Plaintiff's affidavit fails to identify her written agreement to remain in Tennessee and teach for the two years after graduation. (Docket Entry No. 46-1). In a report on Plaintiff's complaints, a TSU representative testified that Plaintiff told her that Plaintiff did not intend to reside in Tennessee after graduation. (Docket Entry No. 46-7 at 6). Given that Plaintiff never disputes that her husband is in the military and that she grew up in California (Docket Entry No. 46-7 at 3, 6), serious factual disputes exists over the core issue of Plaintiff's eligibility for the grant and her status as a typical and adequate class representative. If the trier of fact

found that Plaintiff did not so agree to remain in Tennessee for the two years to teach in a Tennessee school, then, if certified the entire class would suffer an adverse determination

The third serious factual issue is Plaintiff's proof that Defendants actually offered Plaintiff a BASE-TN recruitment grant for the 2007-08 academic year, but Plaintiff declined to accept the grant. (Docket Entry No. 46-7 at 1). If the trier of fact found Plaintiff's declination of the BASE-TN grant to be true, that fact would be adverse to the class and thus, seriously impair Plaintiff's ability to represent non-African American students who were denied "the opportunity to receive funding" for a BASE-TN recruitment grant. (Docket Entry No. 46, Plaintiff's Memorandum defining her putative class).

The Court has difficulty understanding Plaintiff's insistence on class certification under factual circumstances that could be detrimental to the class. As stated in the original Memorandum denying Plaintiff's motion for class certification: "[T]he Sixth Circuit explained that it 'reviews the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and **to consider whether the class members have interests that are not antagonistic to one another.**'" (Docket Entry No. 51, Memorandum at 12) (quoting Beattie v. CenturyTel, Inc.,511 F.3d 554, 562-63 (6th Cir. 2007) (quoting Stout v. J.D. Byder, 228 F.3d 709, 717 (6th Cir. 2000)) (internal quotation in cites omitted) (emphasis added).

Moreover, there are multiple requirements for eligibility for a BASE-TN recruitment grant: a Tennessee resident for a minimum of twelve consecutive months prior to receiving the BASE-TN Support, cannot be licensed as a Tennessee special education teacher; cannot be the recipient of similar financial aid, must possess a "B" average; and execute a written service agreement to work in a Tennessee public school as a special education teacher for two years for

each academic year funded through the program. (Docket Entry No. 46-8 at 9). The proof from TDOE and TSU officials is that the two years teaching commitment limited enrollment in the BASE-TN recruitment program and caused its termination. These grant requirements and actual effects of those requirements create fact specific inquiry of whether the putative class members actually satisfy the qualifications of the grant. As stated in the original Memorandum, "where the nature of the legal claims are such that individuals would have to submit separate proofs to establish liability, class actions are disapproved due to lack of commonality."(Docket Entry No, 51, Memorandum at 9) (quoting Saur v. Snappy Apple, 203 F.R.D. 281, 287 (W.D. Mich. 2001)).

Finally, based upon Plaintiff's proof about the BASE-TN recruitment program, this program was intended for 12 to 19 students in a given year. (Docket Entry No. 46, Exhibit I at 10; Exhibit L at 1; Exhibit N at 2; Exhibit O at 1). at 6). Of those students who actually enrolled in the BASE-TN recruitment programs and depending on the level of overlap with the two year program, there were 26 to 35 white students who received BASE-TN grants. Id. at Exhibit G at 6. In her affidavit, Plaintiff refers to 12 non-African American students who attended the meeting on her complaint of racial discrimination.(Docket entry No. 46-1, Cela Affidavit at ¶ 20). These facts undermine any finding of numerosity as found earlier by the Court (Docket Entry No.51, Memorandum at 8).

To be sure, Dr. Ashford states that "**several white students** who needed financial aid, who wanted to work in the Tennessee public school system and who were qualified for the BASE-TN grant. I am aware that **several of these white students**" did not receive a grant. (Docket Entry No. 62-1 at ¶¶ 10-11) (emphasis added). Dr. Ashton, however, does not provide any time reference for his statements nor any estimate of the"several" white students to whom he

13

refers. Black's Law Dictionary defines "several" as "More than two, often used to designate a number greater than one". Black's Law Dictionary at 1540 (Rev. 4th Ed. 1968). Moreover, Dr. Ashford's statements are at variance with Plaintiff's statistical proof on the BASE-TN recruitment program. Supra at 7-8. In any event, Dr. Ashford's statements do not suggest the 40 or more putative class members considered necessary to satisfy the numerosity requirement of Rule 23 (a). (Docket Entry No. 51, Memorandum at 8) (citing Vol. 5 Moore's Federal Practice at § 23.22 at nns. 6-8).

Finally, as stated in the earlier Memorandum, Plaintiff can seek injunctive relief that would inure to the benefit of all persons similarly situated rendering class certification unnecessary. Craft v. Memphis Light Gas & Water, 534 F.2d 664, 686 (6th Cir, 1976) aff'd on other grds, 436 U.S. 1 (1978).

For these collective reasons, the Court concludes that Plaintiff fails to show "a clear error of law, newly discovered evidence, an intervening change in controlling law, or [that reversal is needed] to prevent manifest injustice." GenCorp, Inc., 178 F.3d at 834. Thus, the Court concludes that Plaintiff's motion to alter or amend should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 6th day of December, 2011.

William J. Haynes, Jr.
United States District Judge